| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE DELAWARE CIRCUIT COURT NO. 3 |
| | ) SS: | |
| DELAWARE COUNTY | ) | CAUSE NO: 18C03-1609-PL-｜04 |

| | |
|---|---|
| NEUROLOGY AND PAIN MANAGEMENT ASSOCIATES, P.C., d/b/a VANGUARD ELDERCARE, a/k/a VANGUARD ELDERCARE MEDICAL GROUP, | ) ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ANTHONY BUNIN, ROBERT CLEMENTE, and BIO-BEHAVIORAL CARE SOLUTIONS, LLC. | ) ) ) |
| | ) |
| Defendants. | ) |

FILED
CLERKS OFFICE
DELAWARE CO., INDIANA

SEP 26 2016

_Mich l a Kng_
CLERK

## COMPLAINT FOR DAMAGES

Plaintiff, Neurology and Pain Management Associates, P.C., d/b/a Vanguard Eldercare, a/k/a Vanguard Eldercare Medical Group, by counsel, DELK McNALLY, LLP, for its Complaint for Damages against Defendant, Anthony Bunin, Robert Clemente and Bio-Behavioral Care Solutions, LLC states as follows:

### Parties, Jurisdiction & Venue

1.    Plaintiff, Neurology and Pain Management Associates, P.C., d/b/a Vanguard Eldercare, a/k/a Vanguard Eldercare Medical Group ("Vanguard"), is an Indiana professional corporation with its principal office located in South Bend, St. Joseph County, Indiana. Vanguard provides on-site, sophisticated specialty senior care services in outpatient offices, acute care hospitals and long-term care facilities.

2.    Defendant, Anthony Bunin ("Bunin"), conducts, and at all times relevant hereto, conducted business within the State of Indiana by providing program and business development and expansion of on-site psychiatric and psychological services in Vanguard's existing facilities

and additional facilities within the State of Indiana, therefore, this Court has personal jurisdiction over Bunin.

     3.     Defendant, Robert Clemente, is a citizen of the State of Michigan and conducts business within the State of Indiana and engaged in illegal and unlawful acts in the State of Indiana. As such, this Court has personal jurisdiction over Defendant Clemente (hereinafter "Clemente").

     4.     Defendant, Bio-Behavioral Care Solutions, LLC, is a Michigan limited liability company that conducts in business in the state of Indiana, and upon information and belief, has, or at least had, an office located in the State of Indiana. As such, this Court has personal jurisdiction over Defendant, Bio-Behavioral Care Solutions, LLC (hereinafter "BCS").

     5.     This is an action brought by Vanguard against Bunin, Clemente and BCS for, among other claims, breach of contract, breach of fiduciary duties, constructive fraud, fraud, tortious interference, unfair competition and conspiracy. In short, while supposedly working for Vanguard, Bunin was surreptitiously working for and acting as an executive officer of BCS, one of Vanguard's direct competitors, all the while informing Vanguard and its principal that Bunin's relationship with BCS had terminated. Bunin provided false information to Vanguard about his efforts to provide program and business development services, expansion of on-site psychiatric and psychological services, marketing and other promotional services pursuant to an independent contractor agreement entered into by and between Bunin and Vanguard. Bunin solicited customers on behalf of BCS and usurped important business opportunities from Vanguard to directly compete against Vanguard, all of which furthered the interests of Bunin, Clemente and BCS. By this action, Vanguard seeks to recover its damages in connection with amounts paid to Bunin under the independent contractor agreement, as well as other damages from Bunin, Clemente and BCS as a result of the Defendants' unlawful conduct.

**Facts Relevant to All Counts**

6.    Vanguard offers psychiatric services in several residential senior facilities and in-patient psychiatric hospitals.

7.    Bunin provides a broad range of marketing, outreach and service programs to residential long-term care and in-patient facilities for seniors, including psychiatric, psychological and education services.

8.    On or about November 1, 2012, Vanguard entered into a Memorandum of Understanding with Bunin whereby Bunin was hired as an independent contractor for Vanguard and the Parties sought to establish a cooperative marketing, strategic alliance and general collaboration, including business and clinical development, educational and liaison functions in defined geographic areas at designated residential senior facilities and for in-patient hospitals affiliated with Vanguard and/or Vanguard's principal ("Agreement"). A true and accurate copy of the terms of the Agreement, which the Parties accepted and acted pursuant to, is attached hereto as Exhibit A. The Agreement sets forth the terms and conditions for which the Parties acted and agreed to during the term of their relationship.

9.    Pursuant to the Agreement, Bunin was required to collaborate in the Indiana market at Vanguard's existing facilities, including but not limited to the facility located in South Bend, Indiana, and to establish a mutually agreed upon service area within which the parties were to function cooperatively. Further, Bunin agreed to provide program and business development and expansion of on-site psychiatric and psychological services for Vanguard.

10.    Bunin was required to work on behalf of the cooperative arrangement for marketing and other promotional services as jointly agreed, market additional nursing facilities in the

3

established service area and work cooperatively with Vanguard to establish the most favorable market position for Vanguard.

11.     Also, pursuant to the Agreement, Bunin was to provide specialized clinical programs to enhance or support those provided by Vanguard, the necessary strategies for the recruitment of supportive clinical staff (e.g., NP's, PA's, PhD's, MSW's) and marketing and business development services at those facilities with a Medicaid population requiring in-patient psychiatric services.  As part of his responsibilities under the Agreement, Bunin was required to expand and promote the collaborative venture into new markets outside of the initial territory, as mutually agreed by the Parties.

12.     Prior to working for Vanguard as an independent contractor, Bunin was an employee of BCS and served as an executive officer position with BCS.  Bunin, BCS and Clemente misled Vanguard by falsely informing Vanguard and its principal that Bunin terminated his employment with BCS upon Bunin's employment relationship with Vanguard; nonetheless, unbeknownst to Vanguard, Bunin was still employed by and, upon information and belief, acting as an executive officer of BCS all the while Bunin was working on behalf of Vanguard and informing Vanguard that he was no longer affiliated with BCS.

13.     Section 6 of the Agreement includes a non-compete clause ("Non-compete Clause"), which states the following:

> [Vanguard] and [Bunin] agree that during the Term and until the expiration of two (2) years following the date of termination or expiration of this Agreement, both Parties will not, directly or indirectly, either for his or her own account or as an employee, agent or member of any type of partnership or legal entity, or as a stockholder, investor, officer or director of a corporation or other legal entity:
>
> A. solicit, take away or divert or attempt to solicit, take away or divert any customers, clients, patients, referral sources or contracted facilities that were previously under contract with either Party or otherwise enter into contractual arrangements with any of them;

      B.   otherwise divert or attempt to divert any business whatsoever or interfere with any business relationship between and any other person, attempt to cause, solicit or encourage any customers, clients, patients, employees, agents or contracted facilities of either Party to refrain, in any respect, from maintaining or acquiring any product or service provided or offered by that Party to any of them or otherwise reduce the volume or scope of its or their relationship;

      C.   recruit or solicit any employee or agent to discontinue such employment or engagement; seek to employ or retain any such employee or agent; or in any manner induce, seek to induce, entice, or endeavor to entice any such person to leave his or her employment or engagement with that Party;

Both Parties agree that the duration, activities restricted and geographic scope of the provisions set forth in Sections 4 and 6 are reasonable, and are reasonably necessary to protect the business and good will of both Parties. If any court or arbiter determines that the duration, activities restricted or geographic scope, or any combination thereof, are unreasonable and that such provision is to that extent unenforceable, both Parties agree that the provision will remain in full force and effect for the greatest time period, with respect to the broadest type of activities described, and in the greatest geographic area that would not render it unenforceable.

(Agreement § 6).

    14.    Vanguard abided by and performed its obligations under the Agreement; however, during the course of his duties to act as an independent contractor to provide services for Vanguard, Bunin was surreptitiously working for BCS.

    15.    While Bunin was supposed to be working for Vanguard, he solicited customers on behalf of BCS, Vanguard's competitor, and interfered with Vanguard's business relationships in an attempt to obtain business for BCS, thereby benefiting himself, BCS, and Clemente (BCS's owner).

    16.    Bunin, acting on his own behalf, but also in furtherance of the conspiracy with BCS and Clemente to thwart Vanguard's business interests, deceived Vanguard by providing Posar, its President, false reports of his activities on behalf of Vanguard. Specifically, Bunin reported to Vanguard that he was meeting with customers and potential customers at Vanguard's existing facilities and other facilities, presenting them with programs and other materials, recruiting staff members for positions at hospitals, developing databases, continuing expansion efforts and efforts

5

to promote in-patient services and opportunities as part of his responsibilities under the Agreement. Instead, Bunin was working and obtaining business for BCS while receiving compensation from Vanguard.

17.     As an example of Bunin's intentional misstatements regarding his actions on behalf of Vanguard, and in furtherance of Defendants' scheme to defraud Vanguard, on July 8, 2015, Posar was informed by Jamie Garcia of Metron that she had no meeting scheduled with Vanguard or Bunin on her calendar and that there never had been a meeting scheduled with Vanguard or Bunin. Nonetheless, Bunin led Posar to believe that Bunin had been meeting with Ms. Garcia and that Bunin and Posar, representing Vanguard, had an appointment scheduled with Ms. Garcia for July 9, 2015, at 2 p.m.

18.     On July 9, 2015, Posar, on behalf of Vanguard, sent a letter to Bunin acknowledging Bunin's misrepresentations and contradictory statements and notified Bunin that Vanguard was terminating all of its relationships with him for cause.

19.     As a result of Bunin's scheme to receive compensation from Vanguard while working for and serving as an officer of one of Vanguard's competitors, Vanguard has suffered significant damages, including but not limited to amounts paid from Vanguard to Bunin and lost business profits.

**COUNT I:  BREACH OF CONTRACT v. ANTHONY BUNIN**

20.     Vanguard restates the allegations set forth in rhetorical paragraphs 1 through 19 as if fully set forth herein.

21.     Vanguard entered into a Memorandum of Understanding with Bunin for the provision of certain services for the direct benefit of Vanguard.  Bunin agreed to the Non-compete Clause provided in Section 6 of the Agreement.

6

22.    The express intent of the Agreement was for Bunin to work as an independent contractor for Vanguard and for the Parties to establish a cooperative marketing, strategic alliance and general collaboration, including business and clinical development, educational and liaison functions in defined geographic areas at designated residential senior facilities and for in-patient hospitals operated by Posar.

23.    Bunin breached the Agreement by surreptitiously working for BCS while he was supposed to be working for Vanguard and providing no services for Vanguard in accordance with the Parties understanding and the Agreement.  Specifically, Bunin was soliciting Vanguard's customers and potential customers on behalf of BCS, interfering with Vanguard's business relationships and committed other acts prohibited under the Non-compete Clause in the Agreement.

24.    Additionally, as described above, Bunin has breached the Agreement by, among other acts, directly or indirectly engaging in the same, or substantially the same, services in markets including the same counties and in contiguous counties that he was supposedly providing for Vanguard; not providing the services as required by the Agreement; diverting away business from Vanguard to its competitor; contacting, soliciting, attempting to solicit seeking to do business with, sell product(s) or service(s) to, or attempting to sell any product(s) or service(s) to Vanguard's customers, clients and/or contacts; being employed by one of Vanguard's competitors; and, upon information and belief, serving as an executive officer for one of Vanguard's competitors.

25.    The above-mentioned contractual limitations on Bunin are reasonable and do not impose a greater restraint than necessary to protect Vanguard from harm suffered as a result of actions such as those committed by Bunin.

7

26.     The above-described conduct by Bunin has caused and will continue to cause Vanguard substantial and irreparable harm.

27.     As a direct and proximate result of Bunin's breaches of his contractual obligations under the Agreement, Vanguard has suffered actual damages in excess of the minimum jurisdictional limits of the Court.

28.     Vanguard has also suffered special and/or consequential damages of lost profits and other damages.

29.     Vanguard has performed all of its obligations under the Agreement.

30.     As a result of Bunin's actions, Vanguard has been forced to retain the undersigned counsel to prosecute this action, and, pursuant to Section 5 of the Agreement, Vanguard is entitled to an award of attorneys' fees and costs associated with this litigation.

WHEREFORE, Plaintiff, Neurology and Pain Management Associates, P.C., d/b/a Vanguard Eldercare, a/k/a Vanguard Eldercare Medical Group, by counsel, respectfully requests judgment in its favor and against Defendant, Anthony Bunin, disgorgement of fees paid by Plaintiff to Bunin under the Agreement, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, attorneys' fees, costs and all other just and proper relief.

## COUNT II:  CONSTRUCTIVE FRAUD v. BUNIN and BCS

31.     Plaintiff restates the allegations set forth in rhetorical paragraphs 1 through 30 as if fully set forth herein.

32.     As an independent contractor and as part of his obligations under the Agreement, Bunin owed a duty of good faith and fair dealing to Vanguard in all aspects regarding their agreement to establish a cooperative marketing, strategic alliance and general collaboration, including business and clinical development, educational and liaison functions in defined

8

geographic areas at designated residential senior facilities and for in-patient hospitals operated by Posar.

33.    Bunin breached his duty of good faith and fair dealing by directly or indirectly engaging in the same or substantially the same services in markets including the same counties and in contiguous counties on behalf of others, including BCS, that Bunin was supposedly providing for Vanguard; diverting away business from Vanguard to its competitor (BCS); contacting, soliciting, attempting to solicit people/entities seeking to do business with, sell product(s) or service(s) to, or attempting to sell any product(s) or service(s) to Vanguard's customers, clients and contacts; being employed by one of Vanguard's competitors; and, upon information and belief, serving as an executive officer for one of Vanguard's competitors while receiving compensation from Vanguard for reportedly carrying out his obligations as an independent contractor under the Agreement.

34.    Bunin further breached his duty of good faith and fair dealing by providing Posar, Vanguard's President, false reports of his activities on behalf of Vanguard and failing to inform Vanguard that he was employed by, and acting on behalf of, BCS as an executive officer, which is a direct competitor of Vanguard.

35.    Bunin engaged in this self-dealing and fraudulent conduct in an effort to devalue Plaintiff and increase the value of BCS for his direct benefit, as well as the direct benefit of BCS and Clemente. Bunin further engaged in these illegal acts in order to divert business away from Vanguard and to BCS, all in an effort to increase the business of BCS and harm Vanguard.

36.    Vanguard has relied upon Bunin's misrepresentations, omissions of fact and fraudulent concealment of information to its detriment and has been injured as a result of Bunin's actions.

37.    As a result of Bunin's actions as described herein, Vanguard has suffered substantial damages, including but not limited to lost profits and monies paid to Bunin. Further, as a result of Bunin's actions, Bunin has realized substantial benefits in the form of excess compensation and a fraudulent increase in value of BCS—all to the detriment of the value of Vanguard.

38.    Bunin performed the acts described above on behalf of BCS and in furtherance of the scheme described herein to defraud Vanguard, harm Vanguard's business and attempt to destroy Vanguard, all the while benefiting BCS, Bunin and Clemente. As such, BCS is responsible for Bunin's actions.

WHEREFORE, Plaintiff, Neurology and Pain Management Associates, P.C., d/b/a Vanguard Eldercare, a/k/a Vanguard Eldercare Medical Group, by counsel, respectfully requests judgment in its favor and against Defendants Bunin and BCS, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, disgorgement of fees paid by Plaintiff to Bunin under the Agreement, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, attorneys' fees, costs and all other just and proper relief.

## COUNT III:  BREACH OF FIDUCIARY DUTY v. BUNIN

39.    Plaintiff restates the allegations set forth in rhetorical paragraphs 1 through 38 as if fully set forth herein.

40.    As an independent contractor and as part of his obligations under the Agreement, Bunin owed Vanguard a fiduciary duty to deal fairly, honestly and openly in all aspects regarding Vanguard and Bunin's Agreement to establish a cooperative marketing, strategic alliance and general collaboration, including business and clinical development, educational and liaison functions in defined geographic areas at designated residential senior facilities.

10

41.    Bunin breached his duty by failing to deal with Vanguard in a fair, honest and open manner and by failing to perform his duties and responsibilities in the manner expected of a duly licensed medical doctor entering into an Agreement to perform services for Vanguard as an independent contractor.

42.    Bunin's breaches include, but are not limited to, directly or indirectly engaging in the same or substantially the same services on behalf of BCS in markets including the same counties and in contiguous counties that he was supposedly providing for Vanguard; diverting away business from Vanguard to its competitor, including BCS; contacting, soliciting, attempting to solicit seeking to do business with, sell product(s) or service(s) to, or attempting to sell any product(s) or service(s) to Vanguard's customers, clients and contacts on behalf of BCS; being employed by one of Vanguard's competitors; and, serving as an executive officer for one of Vanguard's competitors (BCS) while receiving compensation from Vanguard for reportedly carrying out his obligations under the Agreement.

43.    Bunin further breached those duties by providing Posar, Vanguard's President, false reports of his activities on behalf of Vanguard and failing to inform Vanguard that he was employed by, and acting on behalf of BCS as executive officer of BCS, all the while Bunin was engaged in a scheme with BCS and Clemente to devalue Vanguard for Bunin's own benefit and the benefit of Clemente and BCS.

44.    As a result of Bunin's breaches of his fiduciary duties to Vanguard, Vanguard has suffered significant financial harm for which Bunin is responsible.

WHEREFORE, Plaintiff, Neurology and Pain Management Associates, P.C., d/b/a Vanguard Eldercare, a/k/a Vanguard Eldercare Medical Group, by counsel, respectfully requests judgment in its favor and against Defendant, Anthony Bunin, a judgment in an amount to

11

sufficiently compensate Plaintiff for all damages it has suffered, disgorgement of fees paid by Plaintiff, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, attorneys' fees, costs and all other just and proper relief.

## COUNT IV: FRAUD v. ANTHONY BUNIN

45.    Plaintiff restates the allegations set forth in rhetorical paragraphs 1 through 44 as if fully set forth herein.

46.    Bunin made false statements of material fact when he falsely reported his efforts to perform services for Vanguard while surreptitiously working for one of its competitors.

47.    Bunin made these statements with knowledge of the falsity of the statements or, in the alternative, with reckless disregard to the truth or falsity of the statements.

48.    Bunin made the false statements of fact with the intent to deceive Vanguard and allow Bunin to continue receiving compensation while he was intentionally harming and devaluing Vanguard for the benefit of its competitor, BCS, Clemente and Bunin, himself, as an executive officer of BCS.

49.    Vanguard was justified in relying upon those statements and did so to its detriment. Specifically, Vanguard was prevented from discovering Bunin's actions until substantial and irreparable harm had been caused to Vanguard after it paid monies to Bunin for the services he purportedly performed for Vanguard and lost business revenue that it could have generated if Bunin had not: directly or indirectly performed the same or substantially the same services in markets including the same counties and in contiguous counties that he was supposedly providing for Vanguard; diverted away business from Vanguard to its competitor; contacted, solicited or attempted to solicit business with, sell product(s) or service(s) to, or attempt to sell any product(s) or service(s) to Vanguard's customers, clients and contacts; been employed by one of Vanguard's

competitors; and, upon information and belief, acted as an executive officer for one of Vanguard's competitors while receiving compensation from Vanguard for reportedly carrying out his obligations under the Agreement.

50.    As a result of Bunin's fraudulent conduct, Bunin has been unjustly enriched through the receipt of inflated compensation from Vanguard for services that were not rendered, and at the same time, as a result of Bunin's efforts, increasing the value of BCS and harming Vanguard.

WHEREFORE, Plaintiff, Neurology and Pain Management Associates, P.C., d/b/a Vanguard Eldercare, a/k/a Vanguard Eldercare Medical Group, by counsel, respectfully requests judgment in its favor and against Defendant, Anthony Bunin, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, disgorgement of fees paid by Plaintiff, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, attorneys' fees, costs and all other just and proper relief.

## COUNT V:    TORTIOUS INTERFERENCE v. ALL DEFENDANTS

50.    Plaintiff restates the allegations set forth in rhetorical paragraphs 1 through 49 as if fully set forth herein.

51.    Vanguard had business relationships with its actual and prospective customers.

52.    Valid contract rights and business opportunities and relationships existed between Vanguard and its customers and potential customers. But for Defendants' misconduct (as described herein), Vanguard and its customers, prospective customers would have continued their relationship with Vanguard and/or entered into valid contracts and/or business relationships with Vanguard.

53.    Bunin, BCS and Clemente had knowledge of the facts and circumstances giving rise to Vanguard's business relationships and/or contracts (actual or prospective), yet Defendants

intentionally, unjustifiably and maliciously interfered with said relationships.

54.    Bunin, acting in concert with BCS and Clemente and in furtherance of BCS's business interests, intentionally, illegally, and without justification, induced Vanguard's customers and/or potential customers not to enter into a contract or business relationship with Vanguard and improperly directed those business contacts and customers to BCS.

55.    Defendants have tortiously and without privilege interfered in Vanguard's business and prospective business by virtue of committing the above-described actions.

56.    Vanguard has suffered and continues to suffer damage as a result of Bunin's tortious interference with business relationships, contracts and prospective contracts with its customers and/or potential customers.

WHEREFORE, Plaintiff, Neurology and Pain Management Associates, P.C., d/b/a Vanguard Eldercare, a/k/a Vanguard Eldercare Medical Group, by counsel, respectfully requests judgment in its favor and against Defendants BCS, Bunin and Clemente, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, disgorgement of fees paid by Plaintiff, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, attorneys' fees, costs and all other just and proper relief.

## COUNT VI:  UNFAIR COMPETITION v. ALL DEFENDANTS

57.    Plaintiff restates the allegations set forth in rhetorical paragraphs 1 through 57 as if fully set forth herein.

58.    Bunin's use of Vanguard's solicitation and methods of solicitation on Vanguard's customers and potential customers comprises unfair and/or deceptive acts or practices.

59.    Bunin engaged in the foregoing deceptive and unlawful acts while serving as an executive officer of BCS, all the while making false statements to Vanguard and others that he was

14

no longer employed by BCS and not affiliated with BCS. Bunin's actions were in furtherance of BCS and Clemente and were done as an executive officer of BCS.

60.    The foregoing unfair and deceptive acts or practices concern transactions and/or business affecting commerce.

61.    Bunin's unfair and/or deceptive acts or practices proximately caused injury to Vanguard.

62.    The foregoing misconduct of Bunin on his own behalf, as well as on behalf of BCS and Clemente, constitutes an unfair method of competition.

63.    As a consequence of the foregoing, Vanguard has suffered and will continue to suffer substantial damages.

64.    The unfair competition was so outrageous, malicious, egregious, wanton and beyond all reasonable standards for its conduct unintentionally, recklessly or with wanton disregard to Vanguard's rights that Vanguard is entitled to an award of punitive damages against all Bunin.

WHEREFORE, Plaintiff, Neurology and Pain Management Associates, P.C., d/b/a Vanguard Eldercare, a/k/a Vanguard Eldercare Medical Group, by counsel, respectfully requests judgment in its favor and against Defendants, Bunin, BCS and Clemente, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, disgorgement of fees paid by Plaintiff, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, attorneys' fees, costs and all other just and proper relief.

### TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP V. BCS & CLEMENTE

65.    Vanguard repeats and incorporates by reference the allegations set forth in paragraphs 1 through 64 as if fully stated herein.

15

66.   BCS and Clemente knew of the existence of the Agreement between Bunin and Vanguard.  The Agreement is a valid and enforceable contract between Bunin and Vanguard.

67.   In furtherance of Defendants' scheme to steal Vanguard's customers and clients and harm Vanguard and promote BCS's business, Clemente and BCS caused and facilitated Bunin's breach of the Agreement with Vanguard.

68.   BCS and Clemente lacked all justification for causing the breach of the Agreement.

69.   As a result of BCS and Clemente's inducement of the breach of the Agreement, Vanguard has been damaged.

WHEREFORE, Plaintiff, Neurology and Pain Management Associates, P.C., d/b/a Vanguard Eldercare, a/k/a Vanguard Eldercare Medical Group, by counsel, respectfully requests judgment in its favor and against Defendants BCS and Clemente, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, disgorgement of fees paid by Plaintiff, a judgment in an amount to sufficiently compensate Plaintiff for all damages it has suffered, attorneys' fees, costs and all other just and proper relief.


## JURY DEMAND

Plaintiff, Neurology and Pain Management Associates, P.C., d/b/a Vanguard Eldercare, a/k/a Vanguard Eldercare Medical Group, by counsel, hereby demands a trial by jury.

16

Respectfully submitted,

DELK McNALLY, LLP

Jason R. Delk, Atty. #24853-18
DELK McNALLY, LLP
211 S. Walnut Street
Muncie, IN 47305
E-mail: delk@delkmcnally.com

DELK McNALLY LLP
211 S. Walnut Street
Muncie, IN 47305
Tel: 765-896-9495
Fax: 888-453-0545
delk@delkmcnally.com

17

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding (hereinafter referred to as "MOU") is made and entered into as of the last day signed below by and between Steven Posar, MD on behalf of Vanguard Services and other in-patient psychiatric facilities operated by SP and having a place of business _____ and Anthony Bunin. Steven Posar, MD (SP) and Anthony Bunin (AB) are each referred to as "Party" or by Initials and collectively as the "Parties."

## TERMS AND CONDITIONS

The Parties intend to work towards a definitive agreement based upon the following outline of basic terms related to a business relationship and shall initiate working together under such terms pending a definitive agreement.

1. The parties intend to negotiate terms of a definitive agreement within one year following the date hereof so as to allow each party the opportunity to assess the merits of such an agreement. If no definitive agreement has been determined within one year than this MOU shall automatically renew for an additional year.

2. The Parties intend that the following elements shall be incorporated in any definitive agreement executed by the Parties:

   A. AB provides a broad range of service programs to residential LTC and in-patient facilities for seniors, including psychiatric, psychological, and education services.

   B. SP presently offers psychiatric services to over _____ residential senior facilities ("existing facilities) under the corporate entity _____ as well as in-patient psychiatric hospitals.

   C. The Parties seek to establish a cooperative marketing, strategic alliance, and general collaboration including business and clinical development, educational and liaison functions in defined geographic areas at designated residential senior facilities and for inpatient hospitals operated by SP.

   D. SP shall agree to the following:

      • To collaborate with AB to establish mutually agreed upon geographic areas which the Parties shall define as the Service Area to first include the Indiana market with SP's existing facilities for behavioral healthcare services.
      • To collaborate with AB in the development, and distribution of expanded clinical programs, marketing and other promotional materials to those existing nursing facilities in the Service Area and to allow AB to educate them about the expanded services offered by SP .
      • To support AB in efforts with existing facilities in the designated service area to accept and engage expanded services.

1 of 6

EXHIBIT

A

- To provide an initial baseline of current gross revenues of existing entity as supported by generally accepted financial and billing records and provide AB 20% of any and all increases to such gross revenues on an ongoing basis. In addition, SP agrees to provide AB a draw against such gross revenue increases in the amount of $_____ per month. SP will provide AB a regular accounting of all fees generated for and gross revenues from the initiation of AB services. Such fees shall be assessed quarterly and adjusted to reflect actual level of gross revenue increases. All financial, billing and related records shall be made available to AB upon request.
- SP shall provide AB, in addition to those fees outlined above, a monthly fee of $_____ to provide marketing and business development services for individuals residing in long-term care centers with a primary payer of Medicaid requiring in-patient services at one of SP's existing in-patient facilities.
- SP shall provide AB a _____% equity share of SP LTC service entity-Vanguard- should increases in gross revenues exceed $_____ per annum. In addition, AB shall be entitled to a percentage of equity in any new ventures outside the current Service Area or as related to expansion of in-patient facilities as agreed by both parties and detailed under separate cover.
- SP shall bill and retain all fees for such expansion of clinical services.
- To collaborate with AB in the implementation of specialized clinical oversight programs or in the development of specialized joint clinical programs.
- To provide the necessary financing, recruitment and operational support to ensure a favorable opportunity for expansion of the collaborative venture.
- To expand and promote the joint arrangement into new markets outside of the initial territory, as mutually agreed by the parties.
- To provide the necessary clinical oversight and professional collaboration to ensure a favorable opportunity for expansion of the entity.

E.  AB shall agree to the following:

- To collaborate in the Indiana market at SP's existing facilities and to establish a mutually agreed upon Service Area within which the Parties shall function cooperatively.
- To provide program and business development and expansion of on-site psychiatric and psychological services in both those existing facilities in the designated service area and additional facilities identified in the service area.
- To work on behalf of the cooperative arrangement for marketing and other promotional services as jointly agreed to those existing nursing facilities in the IN market and other designated facilities in the approved Service Area.

2 of 6

- To market additional nursing facilities in the Service Area and work cooperatively with SP to establish the most favorable market position for SP, Vanguard, and in-patient hospitals.
- To provide enhancement of internal systems and operational efforts to allow for expanded clinical services.
- To review billing and collection processes to promote optimal use of existing CPT codes.
- To develop and participate in maintenance of a Corporate Compliance Program to ensure appropriate QA/UR procedures are maintained.
- To provide specialized clinical programs to enhance or support those provided by SP and to provide the necessary strategies for the recruitment of supportive clinical staff (e.g., NP's, PA's, PhD's, MSW's) to service those existing facilities or new facilities in the service area.
- To provide marketing and business development services at those facilities with a Medicaid population requiring in-patient psychiatric services at one of SP's existing hospitals.
- AB agrees to allow SP the ability to review any clinical programs or initiatives prior to implementation as well as any suggested CPT coding or other practices at the existing or designated facilities in the service area.
- To develop the necessary Guidelines and Manuals for provision of such services and provide adequate orientation of all clinical staff.
- To expand and promote the collaborative venture into new markets outside of the initial territory, as mutually agreed by the parties.

3. The provisions of this MOU describe the basis for which the Parties are willing to enter into a definitive agreement and do manifest an intention to make a commitment that may include further negotiations and agreement with respect to specific contractual terms and conditions. However, such general terms and conditions shall be the basis for the initiation of services for one year from the date herein.

4. Both Parties shall maintain the confidentiality of any confidential or proprietary information of the other party, including, but not limited to, any confidential pricing, marketing or product information; patient health information; Company operations, pharmacy services data; pharmacy consultation services clinical methods and algorithms; information on invoices; management information reports; cost analysis reports; financial reports; quality improvement reports; this Agreement, its terms, conditions and contents; and any other information designated as confidential or proprietary by the disclosing party (collectively "Confidential Information"). Such Confidential Information shall not include information that: (a) the other party can show by written records to have been in its possession prior to receiving such information, (b) is now or later becomes available to the public through no fault of the Party receiving the information, (c) is received from a third party which had the right to disclose the information, or (d) is approved by the other Party for disclosure. Confidential Information shall not be used by or for the benefit of the other Party, directly or indirectly, except as may be necessary to carry out this Agreement. Immediately upon the

MOU Dr. Posar                                                          Confidential and Proprietary

expiration or other termination of this Agreement, each Party upon written request shall return to the other party any and all copies of the other Party's Confidential Information, provided that one copy may be kept for archival purposes pursuant to the confidentiality and disclosure requirements of this Agreement. Notwithstanding the foregoing, the parties may disclose their relationship as required by law. If a party is compelled by law to disclose Confidential Information of the other Party, and/or terms of this Agreement, it will use reasonable efforts to provide written notice to the other Party before making such disclosure.

The Parties acknowledge that they may acquire access to individually identifiable health information which is considered private, privileged and confidential. To the extent such information is deemed to be protected health information ("PHI") for purposes of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), P.L. 104-191, the Parties are required to and hereby agree to, maintain the private, privileged and confidential status of the PHI. The Parties also agree to use the information only for those purposes enumerated in this Agreement as required or permitted by HIPAA. In addition, if either party disclosed any PHI to a business partner pursuant to a written contract, the written contract shall meet the requirements of HIPAA.

5.  SP shall indemnify, defend, and hold the harmless AB from any and all losses, liabilities, claims, actions, causes or action, damages, interest, expenses, attorney's fees, or other costs arising out of any damage or injury to persons or property caused by or sustained in connection with the performance of this Agreement with AB or arising out of any violation or breach by AB of any applicable statue, law, rule, regulation, code, or ordinance, or any provision of this Agreement by the Provider.

    AB shall indemnify, defend, and hold the SP harmless from any and all losses, liabilities, claims, actions, causes or action, damages, interest, expenses, attorney's fees, or other costs arising out of any damage or injury to persons or property caused by or sustained in connection with the performance of this Agreement with SP or arising out of any violation or breach by SP of any applicable statue, law, rule, regulation, code, or ordinance, or any provision of this Agreement by SP.

6.  SP and AB agree that during the Term and until the expiration of two (2) years following the date of termination or expiration of this Agreement, both Parties will not, directly or indirectly, either for his or her own account or as an employee, agent or member of any type of partnership or legal entity, or as a stockholder, investor, officer or director of a corporation or other legal entity:
    A.  solicit, take away or divert or attempt to solicit, take away or divert any customers, clients, patients, referral sources or contracted facilities that were previously under contract with either Party or otherwise enter into contractual arrangements with any of them;
    B.  otherwise divert or attempt to divert any business whatsoever or interfere with any business relationship between and any other person, attempt to cause, solicit or encourage any customers, clients, patients, employees, agents or contracted facilities of either Party to refrain, in any respect, from maintaining or acquiring any product or

4 of 6

service provided or offered by that Party to any of them or otherwise reduce the volume or scope of its or their relationship;

    C. recruit or solicit any employee or agent to discontinue such employment or engagement; seek to employ or retain any such employee or agent; or in any manner induce, seek to induce, entice, or endeavor to entice any such person to leave his or her employment or engagement with that Party;

Both Parties agree that the duration, activities restricted and geographic scope of the provisions set forth in Sections 4 and 6 are reasonable, and are reasonably necessary to protect the business and good will of both Parties. If any court or arbiter determines that the duration, activities restricted or geographic scope, or any combination thereof, are unreasonable and that such provision is to that extent unenforceable, both Parties agree that the provision will remain in full force and effect for the greatest time period, with respect to the broadest type of activities described, and in the greatest geographic area that would not render it unenforceable.

7. This MOU may be terminated under the following circumstances:
   - A. Upon the execution of a full-time Employment Agreement for AB.
   - B. At the election of the solvent Party, in the event of dissolution of a Party or the filing of a Bankruptcy or other insolvency related proceeding.
   - C. At the election of the non-breaching Party, upon any material breach of this MOU which remains uncured after thirty (30) days prior written notice of the breach.
   - D. Upon any written determination of a qualified professional of a Party (confirmed by a comparable professional regarding the other Party) that applicable laws, regulations or governmental or quasi-governmental standards make this MOU incapable of being performed by operation of law or otherwise is in conflict with the laws governing service to Medicare beneficiaries.

8. Except as otherwise expressly set forth herein and agreed to hereunder, each Party individually shall be responsible for and bear all of its own costs and expenses associated with this MOU.

9. This MOU is not intended to be, nor shall it be construed as, a joint venture, association, partnership, franchise, or other form of business organization or agency relationship.

10. All notices under this MOU shall be in writing and shall be deemed to have been adequately given when such notice is sent by reputable overnight carrier and received by the Party to whom such notice or request is given.

11. Neither party may assign any of its rights or interests hereunder. Both parties represent that its employees and agents are not subject to the terms of any agreement or fiduciary obligation which would be breached by entering into or carrying out the terms of this MOU or the contemplated definitive agreement.

12. This MOU shall be governed by, interpreted, and construed in all respects in accordance with the laws of the State of Indiana, but without reference to its conflict of laws provisions.

5 of 6

Confidential and Proprietary

13. If any provision of this MOU is found to be illegal, invalid, or unenforceable, such determination shall not affect the validity, legality, or enforceability of any other provision of this MOU which are intended to be binding.

14. This MOU constitutes the entire understanding between the Parties concerning the subject matter hereof and supersedes and merges all prior and contemporaneous agreements, oral or written, with respect thereto. This MOU may not be changed, modified, or altered, nor any of its provisions waived, except by an agreement in writing signed by both Parties hereto.

15. In no event shall either Party be liable for any loss of profits, business interruption or any other indirect, consequential, incidental, special, punitive or exemplary damages of any kind howsoever arising, incurred by the other Party even if the first Party has been advised of the possibility of the same or even if the same were reasonably foreseeable.

16. In the event of termination, the Parties will cooperate in a reasonable transition period to minimize the damage or injury which might be sustained by either party.

Agreed to and accepted by:

**Anthony E. Bunin**                              **Steven Posar, MD**
                                                  For:

Sign: _____        Sign: _____

Name: _____        Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

6 of 6

Confidential and Proprietary